That leads us to our final case this morning, number 22-12-58, Janssen Pharmaceuticals v. Teva Pharmaceuticals. Okay, Mr. O'Quinn. Thank you, Judge Dike, and may it please the Court, John O'Quinn on behalf of the appellants. The District Court's decision improperly raises the legal bar for obviousness and underreads the prior art, reading each reference narrowly in isolation without considering what a skilled artisan would have understood from the art taken as a whole. To be clear, these claims are directed to using a known drug for a known purpose in amounts known to be safe and effective, injected into one of three standard intramuscular injection sites, all of which was disclosed in the prior art 544 patent and also disclosed in the prior art W0384 application. Each one discloses all of those. The claims do not require any particular form of efficacy, not rapid efficacy, not comparative efficacy, for example, to the baseline Risperidone product, not generalized majority population efficacy or efficacy in people with high BMI. Yet the District Court read the claims as if they required each for purposes of what would motivate a skilled artisan and for purposes of what would constitute a reasonable expectation of success. The inventors, however, at the time they filed the application, none of the things that the District Court relied on were things that they were, number one, aware of, and number two, that they focused on with respect to the application that they submitted. Indeed, there's nothing critical about the specific claimed doses, all of which fall in the prior art ranges. The patent application specification and the original claims... Let me interrupt you because time is short. Let's assume that I agree with at least some of your criticism or suggestions about what was lacking in terms of the analysis here. I guess it leads me to wonder, what went awry? This is a very experienced, learned judge. One of the answers to that could be that your evidence was just insufficient, that the record was insufficient, that you didn't have evidence. They made certain claims. Their experts said stuff that maybe wasn't right, but there wasn't enough on the other side to rebut it. Help me out here. I don't know what to make of this record. That also affects what we do with this case in terms of reversals and remands and do-overs and things of that sort. Sure, and I'm happy to address each of those. Let me just start by saying I think what the District Court did was commit methodological errors in how it assessed the significance of what the prior art teaches because there's no dispute about what the prior art actually says. I don't think that there's really much of a dispute about what the prior art actually discloses. Are there errors of law, therefore, because she applied the wrong standard? I think that's exactly right, Judge Prost. I think at a minimum, that would require a remand. I think that at a maximum, the court, based on the record, can simply flat-out reverse because of the things that are not disputed here. There are three categories of stuff, or at least I've put them in three categories. Let's start with renal, or let's start with the question of where you inject the drug. Your argument is there are three options. I don't think there's any dispute that there were two or possibly three options for intramuscular injections. But she said your evidence was lacking because... That, I think, is a little bit of a mystery, Judge Prost, because when she, for example, looked at the two textbooks that made clear that deltoid and gluteal injections were interchangeable, yes, there were trade-offs. There were known trade-offs in terms of pain, in terms of the vascularization of the deltoid as opposed to the gluteal, but those are things that are all known. The district court proceeds to distinguish the textbooks because they didn't expressly address caliperidone, or they didn't expressly address loading doses. You can see that at Appendix 75. I think that's doing exactly what this court said in Allergan v. Apotex, that you can't do an overly cramped view of what the art teaches as opposed to looking at the art as a whole. The district court criticized our expert, for example, for saying he was only relying on these textbooks to explain that deltoid and gluteal were interchangeable, not for the concept of a loading or an initial dose. That concept, of course, comes from the 548 protocol, which was a Phase III protocol, which this court recognized. Okay, but moving to the dosing, there is some differentiation in terms of the claimed amounts and the sequence and what was in the prior art, right? So somebody had to get you to the step of why you would have been motivated to make those changes, even though they may not be astronomical. Right, well, so two points, Judge Crouse. First, I don't actually think that there's a difference in terms of the amount of the doses versus what was in the prior art. That is to say, in the claimed regimen, the dose is 150, then 100, then 25 to 150. Each one of those doses is disclosed in both the 544 patent and the W0384 application. That's because they disclose a range. They disclose a range. The W0384 actually does it very explicitly of the 25 to 150, saying that you can administer anything in between based on the dose needed by a particular patient. And so our legal argument that the district court didn't seem to appreciate is that under this court's case law about ranges, these are presumed obvious, because all they did is take one... Is there a difference, though, between just the ranges and the specifics for just regular dosing and the specific numbers for the initial dosing, the loading doses? And so is there... I mean, I don't know that there is any distinction from those range cases, but let's just assume there are, that you have to go beyond saying the prior art shows the range, but you have to show the prior art shows that you would specifically pick out these amounts or close to them as the loading doses. So, Judge Hughes, I think there are two issues. One is, is the amount within a prior art range such that the amount is obvious? And then the second question is, is it obvious that you could initiate therapy using loading doses? As to the first, I have multiple arguments, but one of them is the range one, because both the 544 and the W0384 disclose 150. They disclose 100. It would be obvious that you could pick any one of them for any one of the doses, and a person of ordinary skill in the art would expect it to work, because both the 544 and the W0384 teach that those injections are therapeutically effective. In fact, Claim 7 of the 544 is a method of treatment claim. Now, with respect to the loading, and this is where I think the district court got somewhat wrapped around the axle, didn't understand that we weren't necessarily relying on a textbook in terms of deltoid versus gluteal for that, but instead we're relying on things like the 548 protocol. Because the 548 protocol, a phase three protocol, which is this court in Enry, Montgomery, 677 F3rd at 1382, said that protocols are far from abstract theories. They are things that persons of ordinary skill in the art can have expectations on, and the protocol tells you that you can expect that it will be safe and effective to dose on day one, and then dose again on day eight. So that teaches loading doses. And that teaches what the claim loading doses, because that is the only difference between what the claims require and what is disclosed in both the 544 and the W038. So why, what is your view, led the district court astray? I mean, I presume you made all of these arguments, or your experts made these arguments before the district court. If I'm wrong about that, let me know. No, we certainly did. So what we're... Well, I think in two ways, Judge Prost. I think one is the district court, as I said, I think fell into the mistake of approaching obviousness as though it was like anticipation, and looking at each of the prior art pieces in isolation and asking, okay, does it show not just the concept of loading, as with Arashevsky, but does it show loading with this particular drug? Or does it show deltoid versus... that the deltoid would be obvious, because it is known to be one of two, possibly three sites where you inject intramuscularly, and said, well, but the 584 protocol didn't involve deltoid, it only involved gluteal, even though the 544, for example, just does intramuscular, doesn't have any distinction. I think the other thing that she did was, I think, frankly, was misled by the story that was told by the other side about why they thought this was a big accomplishment and their motivations. And there are two parts to that. One, if you look at the record, what they said their motivation was, this is appendix 10,796, they were motivated to find a quote, universal, one-size-fits-all dosing regimen, end quote, or at appendix 10,897, they said, quote, you don't want, as a big company, just to bring something to the market that works, it has to be good for as high a percentage of patients as possible, end quote. And I think the district court embraced that with the idea that this had to be a generalized regimen, in which was looking for expectation of success across a population, as opposed to what a skilled artisan would have looked like and what would have motivated a skilled artisan, is, knowing what I know about the ranges that are disclosed in the prior art, can I reasonably expect that this regimen, and many others, would work in a patient? Let me ask you, your other part of the argument in that regard is that you make two arguments about the claims. One, they don't specifically call out a generalized population, they deal with one patient. And two, they don't specifically require safe and efficacious use. Yes. On the second, whether they require it or not, if we're talking about the motivation to combine isn't, when we're talking about drugs, isn't safety a factor in that? And also, isn't it just, in a regular non-drug case, you still have, like, will it work? And will it work in the drug context means kind of like it's not going to kill people, it's going to help them. So I understand, I take your point that the claims don't explicitly require it. But why is thinking about that not relevant to the issues of motivation and reasonable expectation of success? Sure, so Judge Prost, just to be clear, I'm not saying that there's a categorical irrelevance to it. What I'm saying is that what the district court was looking at, both for purposes of efficacy, and I'll talk about safety in just a second, was the idea that it would be efficacious across the population. That this would essentially be the best. That this would be the one that would work the best. And you wouldn't expect. And in fact, when you look at what the district court says at Appendix 78 and Appendix 87 to 88, she specifically talks about the fact that you wouldn't expect success in a generalized way. And my modest point is simply that that's not what needs to be expected. What needs to be expected is that this regimen could reasonably be expected to work within a patient. That is, that with some patient, based on their specific conditions, that you would expect that this regimen would potentially be useful. Now, with respect to safety, two points. So wait a second. And there are two issues here. One is whether safety and efficacy is relevant to the satisfaction of the individual claim limitations. And that's not a requirement in this patent or a decision in United Therapeutics makes clear that you don't weed that into the claims. Correct. Nonetheless, safety and efficacy can be relevant as Judge Post suggests to the question of motivation. And she basically said no motivation because no showing of safety and efficacy. What is your theory as to what the motivation of combining was if it wasn't safety and efficacy? Well, Judge Dyke, I think safety and efficacy was demonstrated by the 544 patent itself.  and then in terms of what motivates, taking what the 544 patent teaches and using loading doses on the front end, very straightforward motivation, which is the challenge of adherence. A lot of testimony about schizophrenia patients not taking the oral medications that they would otherwise take at the front end. And so there was an obvious motivation. That was the whole point of the prior art 548 protocol was to examine the use of loading doses so that you could overcome the adherence problem. But with respect to safety and efficacy, again, two points. The 544 expressly teaches that it results from, quote, investigations into development of an efficient, well-tolerated depot formulation, which is therapeutically effective for one month, end quote. That's Appendix 13,238, Column 2, starting at line 38. So the 544 teaches you that these doses are both safe and effective. The only thing that the 544, and for that matter, the W0384 publication doesn't address is is it safe and effective to do a second dose on day 8? Because it's already taught you about the one-month intervals. It's about day 8. And surely, if you could take... The problem with that is that the patent actually says that the second dose, the 100-milligram dose, can be the same as the maintenance dose. That's exactly right. And so I was going to make two points about this. I mean, number one, the patent doesn't just claim 150, 100, 25, which is the way that the district court seemed to treat it. It claims 150, 100, 100, 100, 100. So there's nothing special about that second dose. And in terms of day 8, a person of ordinary skill in the art would know that it would be safe, and they'd know it from the W03... protocol. That's a phase 3 protocol. Safety is generally considered to be established before you go into phase 3 trials. And as this court said in the Montgomery case that I cited just a moment ago, that you can have a reasonable expectation of success with phase 3 trials. Now, in addition, a person of ordinary skill in the art... I see I'm well past my time. I'll finish this one point with the court's permission. And if the court has other questions, I'm happy to answer them. And that was just simply to say that between the 548 protocol, the phase 2 results which were in the prior art, the Jancic article at appendix 13,279, a person of ordinary skill in the art would have had every expectation that dosing on day 8, whether you did 150 and 150, or 150 and 100, would be safe. And I think that answers, you know, all of the concerns that the district court didn't seem to address were in the record. I'm happy to answer additional questions, and I appreciate the court's indulgence. So we'll give you two minutes for rebuttal. Thank you, Judge Steik. Ms. Mullen. Thank you, Your Honor. May it please the court, Barbara Mullen representing Jancic. So what we've heard on appeal and the arguments that Tavit is making are very much divorced from the actual trial record and what happened below. Tavit is essentially asking this court to adopt its attorney arguments on how the prior art should be interpreted in lieu of the district court's factual findings. And if you look at the district court opinion, you'll see that what the court did was consider and reject each of Tavit's theories that they advanced at trial, citing the substantial... That may be, but the question is what she might have been doing. Well, I can address each one of those points. I mean, I'm happy to take them in, I think, the order in which they came up. In terms of deltoid injection, deltoid injection is not just about it being one of three places where somebody can get an injection. In the context of this claim, when you look at what's being claimed as a whole, you are talking about giving a long-acting injectable or depot injection in the deltoid. And if you put this into the context of what Tavit's theories were, again, because what the court did was reject Tavit's theories, if you put it into the context of what Tavit's theories were at trial, it was that a skilled artisan would start with the 548 protocol, which requires all gluteal injections and all equal doses for the injections. The theory was that they would start with the 548 protocol and a person of ordinary skill would be motivated to change that, to change one of those things to the deltoid injections. What was the case that Tavit tried about that? They said they would be motivated to change to deltoid injections to achieve rapid efficacy. But as a matter of fact, the court determined that the references in the prior act did not support that theory. Why? Because Tavit's expert said, we all know that there's more perfusion in the deltoid muscle than in the gluteal muscle. So I look at a reference, and it says, therefore, you may have faster absorption in the deltoid muscle. What he ignored, and what the district court noted, was that that only applies to immediate release formulations. It doesn't apply to long-acting or depot formulations like the formulations at issue here. But as he said at trial, he ignored that part because it wasn't what he was relying on. Can I ask you about the district court's analysis of that point then? I mean, she had three reasons, and I paused about all of them. But then the last reason, she concluded that even though half of all patients prefer shoulder injections, at best, that evidence would suggest using deltoid administration on an individualized basis or be a mere lack of dissuasion from using shoulder injections. Is that right as a matter of law, the way we think about the kind of motivation that's necessary, at least in an obvious, to try when there are three options on the table, two or three options on the table, and that way of analyzing it is a reason to not find motivation? Well, there's a few answers to that. One is in the context of obvious to try, it would have to be one of a number of finite and predictable solutions or predictable outcomes that come from that. Why isn't that true here? Pardon me? Why isn't that true? Because nobody knew what was going to happen when you injected a long-acting injectable into the deltoid muscle. Nobody knew that that would achieve rapid efficacy. That was not something that was taught in dialogue. Well, if we're talking about obvious to try, it's not that nobody knew it would work. It's obvious enough to try when there are a limited number of options, and you've got this kind of evidence about patient's preference. Well, patient's preference, the evidence was a little bit ambiguous, but the court is using it here in the same context as the court talked about the 544, Patton, and Arashefsky. This is a regimen. It was not Tavist-Eriot trial that maybe they were trying to prove obviousness of something that wasn't a regimen. Everybody agrees this is a regimen. The court said it's for a person. It's true, but each and every a person gets the same regimen, which is 150 in the deltoid on day one, 100 in the deltoid about a week later, of a depo injection. So it's a regimen, and this is distinguished from the individualized approaches, such as, for example, in the 544, Patton, where dosing was 2 to 4 milligrams per kilogram of body weight. There was no evidence about ever being injected into a human. It was only injected into fecal dogs. And the prior art, all the prior art drugs for long-acting injectables, they were injected in the gluteal, and there was good reason, because as the district court noted, the Gavaldi reference teaches that when you give a depo injection, you give it in the gluteal. Why? They're big injections. It's very painful to put it in the deltoid. The prior art actually taught you don't give this kind of injection in the deltoid. So if you're going to... So the invention is putting it in the shoulder muscle? No, the invention is actually a unique combination of elements that if you look at the 548 protocol, if you just want to say, rapid efficacy, let's give the highest dose possible, the 548 protocol would tell you to give 150 and 150 in the gluteal muscle. Didn't work. It didn't provide rapid efficacy. It failed to have any efficacy in US patients. It had only efficacy with respect to the 100 mg equivalent dose. The 150 mg equivalent dose had no efficacy anywhere. And for everyone who was tested, there was no rapid efficacy using the protocols in the 548 patent. Now you change that, and what do you change? You change very specific things. You start to use unequal loading doses, not 150, 150. I'm sorry, I didn't mean to cut you off, Your Honor. And you move away from the gluteal injection site, which was taught by the prior art as the location where you want to give these high-volume painful injections. So you're moving away from what the prior art taught, and you're saying, okay, let's give 150, and then 100 in the deltoid. And then a maintenance dose of 100 after that. Well, the maintenance doses can vary after that, that's right. So the patent would cover a 150 loading dose and then 100 air-ex, right? It could, yes. And there's even a larger thing for the monthly stuff? There's even a larger range? There's a larger range, right, to 150. But the point to this really is, as both experts agreed at trial, it's those first two loading doses that provide rapid efficacy, and that was something that had never been seen before with a long-acting injectable. You said the first two loading doses, but the second loading dose could be the same as the maintenance dose. It could be, in effect, another maintenance dose. Except that it's not given a month after the first dose. If you go back to the way long-acting injectables were given, they were given even in the 544 patent, as my colleague pointed out, every month. No, but Judge Dyke's point is that the range is within the long-term range, right? So what's the answer to that? The 150 is within the range, but it's not a range. It's a specific dose. It's a specific sequence. What's the long-term dosage? What's the long-term dosage? 25 to 150 every about month. Monthly plus or minus seven days, right? And that is actually serving a different function in the claims. As both experts agreed, that actually provides long-term efficacy, which is what, for example, was described in the 544 patent. The 544 patent talked about a formulation of paliperidone palmitate that would be given every three weeks to a month. There's no mention in the prior art 544 patent of using any paliperidone palmitate formulation as a loading dose. And, in fact, again, if you look at the Gabaldi reference, Gabaldi teaches you don't use decone injections to initiate therapy. So this was a deviation from what was going on in the prior art, and it was something, frankly, that, as I said, the 548 protocol, that was a phase 3 clinical trial. It failed. I thought there was plenty of evidence that in the prior art people used loading doses. It wasn't something new. Loading doses were used in, for example, Arashefsky. Arashefsky talked about loading doses for haloperidol that were based on taking your oral dose that you'd been stabilized on and multiplying it by 20 or 25 times and giving that as a long-acting injectable. That's not the approach in this patent. This is a regimen. This is a regimen where very specific doses are given. Yeah, but I thought there was evidence in the prior art in an injection context of giving loading doses. Correct? Well, there's two things. One is Arashefsky talks about loading doses in terms of... But it's an individualized approach to dosing. It's not a regimen-based approach. The 548 protocol, I think, is what they rely on for the most part as talking about loading doses, at least if you consider the doses on day 1 and day 8 to be loading. But the critical part here is that the 548 protocol, which is a phase 3 trial, which everyone, I suppose, if you accept what they say, expected to succeed, failed. You gave 150 and 150 on day 1 and day 8? No efficacy. No matter what you gave, it was 50 megaequivalents in 4 doses, 100 megaequivalents in 4 doses, 150 megaequivalents in 4 doses. It didn't matter what you gave. Nobody got rapid efficacy that way. It wasn't until the inventors figured out that you had this combination. And not just of the highest doses, right? Because it does have to be safe. These are long-acting injectables with very serious side effects. You can't give somebody something that's going to give them a horrible side effect. What did the inventors discover about the dosing? Well, the inventors had actually originally developed the protocol that ended up as NCT 548, right? That's the 548 protocol. That was a phase 3 clinical study that they expected to work, which relied on giving 150 milligram equivalent doses on 4 different days, or 100 megaequivalent doses on 4 different days, or 50. And they expected that that would succeed. But the 548 protocol doses on day 1 and day 8. Correct. So that's loading, right? That could be loading, but it failed. As a matter of fact, it failed. It did not load. It did not achieve rapid efficacy. That was the result of the clinical trial. I would have thought that your argument might be that there was a criticality here within the range, but my recollection is there wasn't any evidence about that, if I'm mistaken. Because it's not really a range case, right? But I'm right, there's no evidence of criticality. Well, there is evidence of criticality. If you look at the 548 protocol that says 150 and 150 doesn't work, 100 and 100 doesn't work, but now if we give precisely 150 on day 1 and 100 on day 8, and we give those injections in the deltoid, now it works. So that is a criticality. But you've mentioned a few times there's no rapid efficacy. There is rapid efficacy with the claims. Yeah, but not with the 548. But where is rapid efficacy required in the claims? Rapid efficacy was dealt with really, well, there's two points. One is that the experts all conceded that that was the purpose of the first and second loading doses, that it actually does achieve rapid efficacy. That's number one. But rapid efficacy was the motivation that Teva alleged for modifying the prior art. So the idea that you would change something to get rapid efficacy, the court rejected that as a matter of fact because Teva failed to prove its case. So it really is, I guess, the 548 patent is the closest prior art. Or the 548 protocol is the closest prior art. This is a difference. The difference is the district court found in a matter of citing expert testimony at least 70 times in its opinion on how the prior art should be interpreted the district court found that Teva had not met its burden of proving that it would have been obvious to modify or that there would have been an obvious motivation to modify the prior art. Let's go back to the 548 protocol. That's the premise of the argument. So the modifications are putting it in the deltoid muscle and starting out with a 150 dose and reducing it thereafter up to 100. Yes. That is different from the prior art. And the question is, and it achieved a different result in kind than what the prior art achieved because it achieved rapid efficacy whereas the 548 protocol did not. And the district court made its findings not just on the basis of the prior art and the expert's interpretation of what the prior art teaches but also on credibility determinations. Teva's expert came in and essentially admitted that the way he got to this was by using hindsight. And the district court made numerous credibility findings where... I'm not sure that's an accurate statement. I mean, he looked at the patent. How could he not look at the patent? It was more than that. It's actually quoted in a footnote in the opinion. But he looked at the patent and then he went back to see if he could find all the pieces in the prior art to match them up to the claims. He did more than that. Well, I mean, that's sort of what obviousness is because you take a look at a claim and you see whether it was obvious in the light of the prior art. How could you do the analysis without looking at the claim? You can't, but you're right. You can't do the analysis without looking at the claim. But then you have to go back and say they still have to prove their obviousness case. And in order to prove their obviousness case, they have to prove that there's a motivation to modify the prior art. Where is that motivation? If you're going to assume that the 548 protocol was successful, why are you going to modify it? Right? There's nothing in the prior art to suggest that you should modify the 548 protocol at all. There's just nothing in the prior art to suggest it. So Teva's expert came up with his own motion. Well, I thought we were past... I mean, KSR says you don't need a specific teaching suggestion or motivation. And just because something's working doesn't mean, end of story, there's no motivation because something is working. Something else is working, so no one would be motivated to try it. I don't understand the analytical framework you're using. The analytical framework is that when KSR is talking about it, it's talking about, and in the case that was recently cited, submitted, they're talking about doing something that's going to be predictable. You're going to have a predictable outcome. Right? And it's not just that it's a change in location. If you look at Dr. Wormaling's testimony, and I think it's quoted... Let's see if I can find it. Dr. Wormaling's testimony at trial. He said that there were a number, a large number, of combinations of injection sites and dose amounts that would change the level of drug in the bloodstream. So in other words, it's going to change the efficacy of the drug. He said there's a large number of possible combinations. Okay? So he admits that this is not the situation where it is a finite number of predictable solutions. And it's not really, again, we're taking this claim apart into pieces as an obvious challenge should not. This should be the invention as a whole, which is very different from the prior art. It provided results that were not achieved by the prior art. Okay. I think we're about out of time. Thank you. Judge Dyke, you asked why they're not arguing criticality, because they can't. And I'd point you to Appendix 170 and 172. This is the patent itself. There is nothing special about the 150-100 loading dose protocol. The patent itself disclosed it is one of at least three optimized loading doses. One is 150-150. One is 150-25. Those are just the ones that they happened to test after they had figured out that they had a problem with the needle length, which is what led to their so-called failures, which weren't failures. And that whole narrative, I think, is part of what misled the district court. But on this issue of criticality, especially look at Appendix 172, Column 28, Lines 3-7, and what you see is that all of these different loading dose combinations, 150-100, 150-150, 150-25, they were all better than placebo. The patent actually reports that the best two were 150-150 and 150-25. There is nothing critical. Those were the only two that the patent reports as having rapid efficacy by day eight in the actual subsequent trials, not 150-100. So what do we do with this? You're not suggesting that there's a basis on this record to necessarily reverse. Well, Judge Preston, I think you can reverse under this court's ranges cases, because every one of these falls within a range. Every one of these things, one of these doses... Is it a hodgepodge that some of the issues can be resolved here and others have to go back? The ultimate question of obviousness, as the court's well aware, is a question of law, and I think that the court can resolve that question based on this record, but at a minimum... I mean, I understand what you're saying, but how do we... If we find that the district court applied the wrong obvious analysis, which led her to improperly reject the motivation to combine, how do we as an institution combine? Isn't that factual? So Judge Hughes, I agree with you if you think that the error here was a methodological one, that the only error here was a methodological one that comes to how the district court considered the prior art, that you need to correct that error, and the appropriate course would be for the fact finder to then consider that under the proper method. I do think, and this is what we argued, and what I'm arguing today is consistent with what you'll find in our post-trial brief, pages 9 to 18, about, for example, the ranges. I think that is an issue that the court could resolve for itself. I know I'm past my time, but two points that I really want to respond to, because I think that they were somewhat misleading. First, this idea that the 150, 150 injections in the 548 protocol didn't work, that's not consistent with what the evidence showed at trial. What the evidence showed was that their experimenters mixed up placebo and mixed up the 150 doses, and you can see this at appendix 22,792, 10,893, and that's why they didn't have data on 150. And my other point, Judge Dyke, is that the 548 protocol was not a failure. You can see that every one of those doses, with one exception, did better than placebo, and you can see that at appendix 22,792 and 10,893. And so we respectfully request that the court vacate the court's obviousness decision, and either reverse or remand. I'm happy to answer any additional questions that the court might have about the record or the legal issues here. Okay, I think we're out of time. Thank you. Thank you, Judge Dyke.